Filed 8/4/16  P. v. Crook CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B265205 |
| Plaintiff and Respondent, | (Los Angeles County |
| v. | Super. Ct. No. BA412380) |
| MICHAEL BRYON CROOK, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Richard S. Kemalyan, Judge.  Vacated in part, affirmed in part, and remanded.

Randy S. Kravis, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Joseph P. Lee and Jaime L. Fuster, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury found defendant Michael Crook guilty of first degree murder. On appeal, defendant contends: 1) the photographic lineup shown to one eyewitness was unduly suggestive and the identification resulting from the lineup and subsequent in-court identifications violated defendant's due process rights; 2) the trial court abused its discretion in excluding a defense argument regarding an unrecorded portion of the eyewitness's discussions with police; 3) a jury instruction on eyewitness identification violated defendant's right to due process; 4) the trial court erred in instructing the jury that the People were not required to prove motive, because the gang enhancement required the jury to make a motive finding; and 5) the prior strike and prior serious felony enhancements must be vacated because defendant did not admit the prior strike and the trial court failed to advise defendant of his *Boykin/Tahl* rights.[1] Defendant also requests that this court review sealed transcripts of in camera trial court proceedings to determine whether the trial court prejudicially erred in refusing to disclose information regarding a confidential informant. We vacate defendant's sentence and remand for retrial of the prior conviction allegations, and otherwise affirm the judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

We summarize the evidence in accordance with the usual rules on appeal. (*People v. Virgil* (2011) 51 Cal.4th 1210, 1263.) On the evening of June 2, 2013, Samuel Burge was shot and killed on a Los Angeles street. Police found a BB gun in Burge's pocket. Around the time of the shooting, and near the same intersection, Tyrone Edmond was standing on a corner, waiting for a ride. Defendant passed Edmond. According to Edmond, defendant was wearing a blue hat with a red bill, a fitted t-shirt, fitted jeans with slits on the side, red Vans shoes, and a glove on one hand. Edmond did not know defendant but had seen him before in the neighborhood. Defendant said "what's up" to Edmond and crossed the street. Edmond heard gunshots. He looked in the direction of the sound. Edmond saw defendant running away from a body on the ground. Defendant ran to a nearby car wash and got into a parked car. The car drove away. Edmond told

---

[1]     *Boykin v. Alabama* (1969) 359 U.S. 238, *In re Tahl* (1969) 1 Cal.3d 122.

police at the scene that he saw the shooter get into a black car—a Ford Fusion or Dodge—driven by a black woman. When interviewed later, Edmond described the shooter as having tattoos on his face, neck, and arms.

At the time of shooting, Conrad Sylvestre-Lamb was washing his car at the car wash. A man he later identified as defendant walked past him and crossed the street. As defendant passed, the two men made brief eye contact. After defendant crossed the street, Sylvestre-Lamb heard gunshots. He saw defendant shooting Burge. Defendant ran back toward the car wash and again made eye contact with Sylvestre-Lamb. Sylvestre-Lamb told police the shooter had black hair, was wearing black pants, dark tennis shoes, and a white t-shirt, and had a complexion darker than Sylvestre-Lamb's own skin; he later said the shooter was wearing a hat. Sylvestre-Lamb identified defendant as the shooter from a six-pack photographic lineup, but he acknowledged at trial that his initial description of the shooter's complexion was wrong. He explained that the glasses he was wearing at the time of the shooting were tinted. He recognized defendant in the photographic lineup based on defendant's narrow face and a tattoo on his neck.

Rosemary Flowers was a co-defendant also charged with murder. She testified at trial in exchange for a "leniency agreement"; in exchange for truthful testimony she was to be allowed to plead to a lesser charge. According to Flowers, at the time of the shooting, she was dating Reginald Shell, a member of the 83 Hoover gang. Flowers was with her cousin and Shell on the day of the shooting. Flowers was driving a Ford Taurus. While Flowers, Shell, and the cousin were parked in the general vicinity of the shooting, another car approached, carrying four people. Defendant was in the back seat of the car. Flowers had seen defendant before; she knew him as "Mike" or "4 Star." A woman in the car yelled that someone had pulled a gun, or "did somebody have heat." Shell told Flowers, "let's go see," so they drove around, then Shell directed Flowers to park at the car wash. Shell was on the phone while Flowers and her cousin were drinking and smoking marijuana. Flowers heard the popping sound of gunshots or firecrackers. She did not see the shooting. As Flowers began to drive away she almost ran into

3

defendant, who was on foot.  Flowers did not see where defendant had come from.  Defendant asked if they could give him a ride.  When he got in the car, defendant said, "I got that," or "I did it."  Flowers was about to ask him what was going on, but Shell told her it was not her business.  Flowers dropped defendant off.  She did not see defendant with a gun before or after the shooting.

Cellphone records showed ten telephone calls around the general time of the shooting between Flowers's cell phone and a number identified as "Mike" in Flowers's phone; the number was associated with defendant's phone.  Flowers asserted Shell must have made the calls.  She denied having additional calls with "Mike" in the days following the shooting, as reflected in cell phone records.  Flowers testified that Shell used her phone on occasion.  She denied putting contact information for "Mike" in her phone and did not know who had.

Police arrested Flowers on June 11, 2013.  She initially lied to police.  Flowers said she was at the car wash because she was washing and vacuuming her car.  She said someone she did not know ran past her car and down the street.  When confronted with information that police already knew someone had entered her car after the shooting, Flowers offered details largely consistent with her testimony at trial.  When left alone in the interview room, Flowers talked to herself, making statements such as:  " 'I have to clear my name' "; " 'Let me get you everything you need.  You all work with me, I will work with you' "; and " 'I don't know.  I will say whatever I can do to get out of this shit.' "  At one point she told a detective:  " 'I will do anything you want, I will wear a wire. . . .  I will take you to the place where these people are at.' "

After the interview, Flowers made several telephone calls from jail; the calls were recorded.  Flowers called Shell.  He told her to be quiet and not to get him involved.  She also called her older sister and told her she "knew the person" and had picked him up by the car wash, but he did not have a gun on him.  In a different telephone conversation with her sister, Flowers said the police were not accusing her of committing the murder, but she knew the person who did it and she had given him a ride.  She also told her sister

4

that when the person got in the car, he said, "I got this." Flowers told her sister she just went in the car wash and, " 'next thing I know, I see . . . Mike, the person I know.' "

Cell phone and cell phone tower data indicated defendant's phone was in use in various sectors serviced by cell phone towers in the area near the shooting, around the time of the shooting. Text messages recovered from defendant's account indicated he sent several messages the day after the shooting in which he said the police were looking for him for a murder, or suggesting he was going to jail. In one message, defendant wrote: "I know what I was getting into before I did it but times I wanna hit tears kuz I may not see you or my kids again." According to police, when defendant sent these messages police had not yet identified him as a suspect in the murder. On June 11, after police had interviewed Flowers, defendant sent text messages again suggesting he was about to go to jail for life. He also wrote: "As to my facebook, my big homey told me to deactivate my page 'cause police can get on there and look at my pics to match the description."

At trial, a gang expert opined defendant was a member of the 94 Hoovers criminal street gang. He further opined, based on a hypothetical consistent with the facts in the case, that a murder carried out under the circumstances presented would be committed for the benefit of the gang. The expert explained the murder would serve to protect the gang's territory and intimidate both citizens in the area and rivals.

Defendant testified at trial. He admitted being a member of the 94 Hoovers criminal street gang. Defendant testified that on June 2, 2013, Flowers called him several times because she wanted to buy marijuana from him. Defendant denied speaking with Shell on the telephone on June 2. He denied being near the intersection where the shooting occurred. He denied getting into Flowers's car on June 2. According to defendant, the day after the shooting, a friend told him police brought up defendant's name in connection with the murder. Defendant did not trust the police and did not think they would believe him. Although at trial he admitted he owned a pair of red shoes that police had recovered from an apartment where defendant sometimes stayed, he denied wearing those shoes on June 2. Defendant had previously lied to police and denied the

5

shoes were his. At trial, he denied he was the person visible on surveillance video getting into Flowers's car after the shooting. He said he sent the text messages about going to jail for murder because he had been alerted that police were looking for him in connection with a murder. He testified the text stating he "knew what he was getting into" was about getting into life as a gang member, including being framed for murder or implicated due to mistaken identity. He asserted he was concerned about deleting his Facebook account because it displayed gang-related pictures.

The jury found defendant guilty of first degree murder. (Pen. Code, § 187, subd. (a).)[2] It found true the allegation that defendant personally and intentionally discharged a firearm, causing great bodily injury and death (§ 12022.53, subd. (d)), and the allegation that the offense was committed for the benefit of, at the direction of, or in association with a criminal street gang with the specific intent to promote, further, or assist in criminal conduct by gang members (§ 186.22, subd. (b)(1)(C)). As discussed in further detail below, defendant, through counsel, admitted a prior strike and serious felony conviction (§§ 667, subds. (b)-(j), 1170.12; § 667, subd. (a)). The trial court sentenced defendant to a total prison term of 80 years to life.

## DISCUSSION

I.     **The Trial Did Not Prejudicially Err in Admitting Sylvestre-Lamb's Pretrial and In-Court Identifications of Defendant**

During the investigation of the case, police showed eyewitness Sylvestre-Lamb a six-pack photographic lineup. Sylvestre-Lamb identified defendant from the lineup and in person at the preliminary hearing. Before trial, defendant sought to exclude the identifications, arguing the photographic line-up was unduly suggestive and it tainted the subsequent in-court identification. Defendant argued the background of his photograph was darker than the background of the other five photographs in the lineup; he was the only suspect with a shaved head; and he was the only suspect with a visible tattoo on his neck. The trial court rejected this argument. Defendant renews the argument on appeal,

---

[2]     All further statutory references are to the Penal Code unless otherwise noted.

6

adding that defendant's skin tone was lighter than that of the other five individuals. We find no reversible error.

" ' "In deciding whether an extrajudicial identification is so unreliable as to violate a defendant's right to due process, the court must ascertain (1) 'whether the identification procedure was unduly suggestive and unnecessary,' and, if so, (2) whether the identification was nevertheless reliable under the totality of the circumstances. [Citations.]" ' [Citation.]" (*People v. Carter* (2005) 36 Cal.4th 1114, 1162.) The court is to consider factors such as " ' "the opportunity of the witness to view the suspect at the time of the offense, the witness's degree of attention at the time of the offense, the accuracy of his or her prior description of the suspect, the level of certainty demonstrated at the time of the identification, and the lapse of time between the offense and the identification." [Citation.] "We review deferentially the trial court's findings of historical fact, especially those that turn on credibility determinations, but we independently review the trial court's ruling regarding whether, under those facts, a pretrial identification procedure was unduly suggestive." [Citation.] "Only if the challenged identification procedure is unnecessarily suggestive is it necessary to determine the reliability of the resulting identification." [Citation.]' [Citations.]" (*People v. Thomas* (2012) 54 Cal.4th 908, 930-931.)

"A due process violation occurs when a pretrial identification procedure is so impermissibly suggestive that it gives rise to a very substantial likelihood of irreparable misidentification. [Citation.] The application of this rule depends on the circumstances of each case [citation], including whether the suggestiveness made the defendant 'stand out' from the others in the lineup [citation] and whether the identification procedure was unnecessary [citation]." (*People v. Carlos* (2006) 138 Cal.App.4th 907, 912.)

We conclude the photographic lineup was not impermissibly suggestive based on the differences defendant has identified.[3] The six photographs depicted a group of six

---

[3]     We have reviewed the original Exhibit No. 31, which is a color version of the photographic lineup.

African American men, all within a similar age range, with a range of skin tones or complexions. The six individuals had similar facial expressions. (*People v. Carter, supra,* 36 Cal.4th at p. 1163.) They each had two white blocked out portions in the same position on their faces—between the eyebrows, and just to the right of the right eye.

As reflected in the photographs, defendant's skin color was not significantly lighter than the individuals in positions 1 and 3. Even if defendant's complexion was lighter, it was not so much lighter than the surrounding individuals that his photograph stood out. Defendant's photograph was the only one depicting an individual with a shaved head, but one other photograph showed a man with extremely short hair; moreover, Sylvestre-Lamb indicated he covered the tops of the photographs because the shooter was wearing a hat. Similarly, while the background in defendant's photograph was darker, there was a range of backgrounds overall within the lineup; the background of defendant's photograph was only slightly darker than that of photograph 4. (*People v. Johnson* (1992) 3 Cal.4th 1183, 1217 [minor differences in facial hair and differences in background color and image size of photographs did not render lineup impermissibly suggestive].) Defendant's visible neck tattoo was partially obscured and the individual depicted in position 3 appeared to have a dark area on his neck that may have been a blurred tattoo. Further, Sylvestre-Lamb had not mentioned a neck tattoo, thus this is not a case in which the presence of an identifying characteristic was unduly suggestive because it corresponded to the witness's prior description. Overall, defendant's photograph was similar to that of the others in the lineup and the identification procedure was not unduly suggestive. (*People v. Cunningham* (2001) 25 Cal.4th 990, 991.)

Further, even if the photographic lineup was unduly suggestive, we would find Sylvestre-Lamb's identification of defendant otherwise reliable under the totality of the circumstances. (*People v. Thomas, supra,* 54 Cal.4th at p. 930.) Sylvestre-Lamb saw the shooter at close proximity before and after the shooting and twice made eye contact with him. Sylvestre-Lamb also saw the shooter running away from Burge's body. At the preliminary hearing, Sylvestre-Lamb testified he was hyper vigilant after defendant walked past him the first time because he "felt a threat." He explained his previous

description of the shooter as having dark skin was due to the shooter having his hat down on his face and the position of the sun. He said he did not initially mention the shooter's evident tattoos because he had not yet developed a level of trust with the detectives. He also explained he had just witnessed a crime and did not want to face retaliation. The identification from the photographic lineup took place less than two weeks after the shooting. In addition, before Sylvestre-Lamb viewed the lineup, he received the admonition that the lineup may or may not contain a picture of the person who committed the crime. Defendant has not shown a substantial likelihood of irreparable misidentification under the totality of the circumstances in this case. (*People v. Cunningham, supra,* 25 Cal.4th at p. 990.)

Because we conclude the photographic lineup was not unduly suggestive or, even if it was, that the identification based on that lineup was reliable under the totality of the circumstances, we reject the argument that an improper photographic lineup identification tainted Sylvestre-Lamb's subsequent in-court identifications of defendant. (*People v. Wash* (1993) 6 Cal.4th 215, 245.)

Finally, even if the Sylvestre-Lamb identifications were admitted in error, we would find the error harmless beyond a reasonable doubt. Sylvestre-Lamb's identifications of defendant were not the only evidence against him, or even the only eyewitness identifications.[4] Edmond had seen defendant in the neighborhood before the shooting and identified him as the man he saw running away from Burge's body. Flowers saw defendant immediately before the shooting with other people looking for someone who had a gun. She then saw him immediately after the shooting, gave him a ride away from the scene, and heard him say something like, "I got that" or "I did it." Information from defendant's phone placed him near the scene at the time of the

---

[4] We also note Sylvestre-Lamb's pre-trial identification of defendant was challenged by the defense. The jury learned that Sylvestre-Lamb said the shooter's skin was darker than his, which was apparently inconsistent with his selection of defendant's photograph from the lineup. Sylvestre-Lamb admitted that when the shooter passed him, the shooter's head was tilted down and he was wearing a hat. The jury also learned Sylvestre-Lamb told police the shooter had no visible tattoos.

9

shooting. Defendant's text messages implicated him in a murder before the police had even identified him as a suspect. In light of this evidence, we would conclude that even if in error, the admission of Sylvestre-Lamb's identifications of defendant was harmless beyond a reasonable doubt. (*People v. Carter, supra,* 36 Cal.4th at p. 1164, fn. 23.)

## II. Any Error in the Trial Court's Ruling Limiting Defense Counsel's Arguments Regarding an Omission From the Recording of Sylvestre-Lamb's Pre-Trial Identification of Defendant Was Harmless

Defendant sought to introduce evidence that an audio recording made when detectives showed Sylvestre-Lamb a photographic lineup was stopped after a detective gave standard pre-lineup admonishments, but before Sylvestre-Lamb made the identification. The prosecution objected that under Evidence Code section 352, the evidence would be misleading and confusing. In an Evidence Code section 402 hearing, defendant offered the testimony of an audio/video recording expert who indicated there was evidence the recording had been stopped. This conflicted with the testimony of the detective in charge of the recording who had previously testified the recording was not stopped during the identification process.

Defendant sought to use the information to impeach the detective's testimony and also as a basis to argue that because it was unknown how long the tape recorder was off, "there perhaps was some sort of conversation that was had, but we will never know because that tape recorder was turned off." The court ruled defense counsel could use the evidence to impeach the detective's testimony. But the court indicated defense counsel could not challenge the detective's credibility about matters on which the detective did not testify. The court also appeared to reject any defense attempt to argue a conversation may have occurred when the recording was stopped. The court concluded there was no evidentiary basis for such arguments. Following the court's ruling, the defense decided not to call the expert as a witness.

On appeal, defendant contends the trial court erred in prohibiting defense counsel from arguing to the jury that there may have been an unrecorded conversation between a detective and Sylvestre-Lamb before Sylvestre-Lamb identified defendant from the

10

photographic lineup. We need not decide the merits of this contention because any error was harmless. As explained above, there was another eyewitness to the crime who identified defendant as the shooter, there was evidence of incriminating statements defendant made immediately after the crime, cellphone data placed him near the scene at the time of the shooting, and defendant's own text messages implicated him in the murder. Even if the trial court erred in excluding a defense argument that a conversation occurred during the period in which the tape was stopped, any error was harmless, under any standard.

III. **The Use of CALCRIM No. 315 Did Not Violate Defendant's Right to Due Process**

The court instructed the jury with CALCRIM No. 315, which provides the jury guidance in evaluating eyewitness identification testimony, including the following question: "How certain was the witness when he or she made an identification?" Although defendant did not object to the use of CALCRIM No. 315, he argues on appeal the instruction violated his right to due process because it conflicted with scientific research indicating a witness's certainty about an identification is not a reliable indicator of the accuracy of the identification.

As an initial matter, the court was not required to modify CALCRIM No. 315 on its own motion. (*People v. Ward* (2005) 36 Cal.4th 186, 213-214; *People v. Sullivan* (2007) 151 Cal.App.4th 524, 561 (*Sullivan*).) Further, as defendant concedes, even in cases in which there is expert testimony about the unreliability of eyewitness identifications, our high court has upheld the use of an instruction that advises the jury to consider a witness's certainty when evaluating the validity of identification testimony. This was true, for example, in *People v. Ward*, a decision issued in 2005, years after the publication of some of the sources defendant cites in his brief as concluding there is only a weak correlation between an eyewitness's confidence and the accuracy of his or her testimony. (*Ward*, at pp. 213-214.)

11

In *People v. Sullivan*, the court was presented with an argument similar to defendant's argument here. The *Sullivan* court concluded:

"[A]lthough the California Supreme Court, like defendant's expert, has referred to studies that indicate a lack of correlation between the degree of confidence an eyewitness expresses in an identification and the accuracy of that identification, this court in *People v. Gaglione* (1994) 26 Cal.App.4th 1291, 1302-1303 [disapproved of another ground by *People v. Martinez* (1995) 11 Cal.4th 434, 452], . . . observed that defendant's argument was 'expressly rejected' in *People v. Wright* (1988) 45 Cal.3d 1126 . . . . In *Wright*, *supra*, at page 1141, the court held that 'a proper instruction on eyewitness identification factors should focus the jury's attention on facts relevant to its determination of the existence of reasonable doubt regarding identification, by listing, in a neutral manner, the relevant factors supported by the evidence. [¶] The instruction should not take a position as to the impact of each of the psychological factors listed.' (Italics omitted.) In *Gaglione*, we noted that the *Wright* opinion 'expressly approved CALJIC No. 2.92, commenting that CALJIC No. 2.92, with appropriate modifications to take into account the evidence presented at trial, will usually provide sufficient guidance on eyewitness identification factors. [Citation.]' (*People v. Gaglione, supra*, at p. 1303, see also [*People v. Johnson, supra,* 3 Cal.4th at pp. 1230-1231].) As in *Gaglione*, we therefore 'reject defendant's arguments and find no error in CALJIC No. 2.92' as given with reference to degree of certainty as a factor in assessing the reliability of eyewitness identification testimony. (*Gaglione, supra*, at p. 1303.)" (*Sullivan*, *supra*, 151 Cal.App.4th at pp. 561-562, fns. omitted.)

We find the *Sullivan* court's reasoning and interpretation of California Supreme Court precedent persuasive. We likewise reject defendant's argument that the trial court erred in failing to eliminate the "certainty" factor from CALCRIM No. 315.[5]

---

[5] We have found the trial court did not prejudicially err in excluding the defense argument regarding the stopped audio recording, or in failing to sua sponte modify CALCRIM No. 315. We also have concluded the trial court did not err in admitting Sylvestre-Lamb's identifications of defendant, and, even if it did err, the error was harmless beyond a reasonable doubt. We therefore reject defendant's argument that cumulative error as to these three issues requires reversal. (*People v. Williams* (2013) 56 Cal.4th 165, 201.)

**IV.     The Trial Court Did Not Err in Failing to Indicate CALCRIM No. 370 Did Not Apply to the Gang Enhancement Allegation**

The trial court instructed the jury with CALCRIM No. 370, as follows: "The People are not required to prove that the defendant had a motive to commit the crime charged.  In reaching your verdict you may, however, consider whether the defendant had a motive.  [¶]  Having a motive may be a factor tending to show that the defendant is guilty.  Not having a motive may be a factor tending to show the defendant is not guilty." Defendant contends this instruction was given in error because it was inconsistent with Penal Code section 186.22, the gang enhancement.  Section 186.22, subdivision (b)(1), prescribes additional punishment for "any person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members."[6] Defendant contends this provision in fact requires the jury to make a specific finding about the defendant's motive before finding the gang enhancement true. We disagree.

As an initial matter, defendant did not request a modification of CALCRIM No. 370 in the trial court, and has therefore forfeited any objection on appeal.  "Failure to object below to an instruction correct in the law forfeits the claim on appeal."  (*People v. Fernandez* (2013) 216 Cal.App.4th 540, 559; *People v. Virgil, supra,* 51 Cal.4th at p. 1260.)  However, the claim also fails on the merits.  As defendant acknowledges, this very argument was rejected in *People v. Fuentes* (2009) 171 Cal.App.4th 1133 (*Fuentes*).

---

[6]     The trial court instructed the jury with CALCRIM No. 1401, which informed the jury that if it found defendant guilty on count one: "you must then decide whether the People have proved the additional allegation that the defendant committed that crime for the benefit of, at the direction of, or in association with a criminal street gang.  You must decide whether the People have proved this allegation for each crime and return a separate finding for each crime.  To prove this allegation, the People must prove that: 1.  The defendant committed the crime for the benefit of, at the direction of, or in association with a criminal street gang; AND 2.  The defendant intended to assist, further, or promote criminal conduct by gang members."

13

In *Fuentes*, the People alleged a section 186.22, subdivision (b) enhancement and a special circumstance under section 190.2, subdivision (a)(22), which required the jury to find the charged murder was carried out to further the activity of a criminal street gang. (*Fuentes*, *supra*, 171 Cal.App.4th at p. 1139.)  The court rejected the defendant's argument that these findings required the jury to also make a finding of motive.  The court explained:  "An intent to further criminal gang activity is no more a 'motive' in legal terms than is any other specific intent.  We do not call a premeditated murderer's intent to kill a 'motive,' though his action is motivated by a desire to cause the victim's death.  Combined, the instructions here told the jury the prosecution must prove that Fuentes intended to further gang activity but need not show what motivated his wish to do so.  This was not ambiguous and there is no reason to think the jury could not understand it.  Fuentes claims the intent to further criminal gang activity should be deemed a motive, but he cites no authority for this position.  There was no error." (*Id.* at pp. 1139-1140.)

The *Fuentes* court acknowledged that a "common-sense concept" of motive might support the idea that an intent to further gang activity is a "motive" for committing a murder:  "A wish to kill the victim was a reason for the shooting, and a wish to further gang activity stood behind that reason." (*Fuentes, supra*, 171 Cal.App.4th at p. 1140.)  But the court explained the jury instructions "were well adapted to cope with the situation.  By listing the various 'intents' the prosecution was required to prove (the intent to kill, the intent to further gang activity), while also saying the prosecution did not have to prove a motive, the instructions told the jury where to cut off the chain of reasons.  This was done without saying anything that would confuse a reasonable juror." (*Ibid.*)

Similarly, in *People v. Snow* (2003) 30 Cal.4th 43, the defendant argued an instruction that motive was not an element of the crime charged and need not be shown conflicted with another special circumstance instruction requiring the jury to find " 'the witness was intentionally killed for the purpose of preventing his testimony in a criminal proceeding'. . . ." (*Id.* at p. 98.)  The court rejected the argument, explaining the

14

instruction on motive referred to the crime charged and not the special circumstance allegation. The court further reasoned: "Even allowing for misunderstanding on that particular point, it was not reasonably likely [citation] that the jurors would have been misled in the manner defendant suggests, as they were repeatedly and expressly instructed to find the special circumstance allegation true only if each element, including the purpose of preventing the victim's testimony, was proved beyond a reasonable doubt. The instructions, taken as a whole, did not deprive defendant of a fair trial or a reliable penalty determination." (*Ibid.*)

We find the reasoning of *Snow* and *Fuentes* court applicable here. The gang enhancement did not require a "motive" finding, in legal terms. While defendant focuses on the "for the benefit of" portion of section 186.22, subdivision (b), that term is one alternative in the statute that also includes "at the direction of," and "in association with," both of which are even further removed from the meaning of "motive," or a reason for committing the crime. Further, as in *Snow*, CALCRIM No. 370 referred to motive with respect to the crime charged, not the gang enhancement.[7]

" ' " '[T]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction.' " ' [Citation.] Instructional error warrants reversal only if there is a reasonable probability that the defendant would have obtained a more favorable outcome without the error. [Citation.]" (*Fuentes*, *supra*, 171 Cal.App.4th at p. 1138.) When the jury instructions are taken together, it is not reasonably probable that the jury misunderstood CALCRIM No. 370 as eliminating the People's burden to establish the gang enhancement by proving the felony was committed for the benefit of, at the direction of, or in association with a criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members. The jury instructions did not use the terms "motive" and "intent" interchangeably, or "motive" and

---

[7] This case is unlike *People v. Valenti* (2016) 243 Cal.App.4th 1140 or *People v. Maurer* (1995) 32 Cal.App.4th 1121, in which it could be said motive *was* in fact an element of the crime charged.

15

"for the benefit of" interchangeably.  There is no reasonable likelihood the jury would have concluded CALCRIM No. 370 negated the required findings specifically set forth in CALCRIM No. 1401.  (*People v. Cash* (2002) 28 Cal.4th 703, 739.)

## V.     No Error With Respect to the Confidential Informant

Before trial, defendant requested discovery regarding the identity of a confidential informant.  A detective's statement noted a citizen informant had "heard on the street" that someone else may have been involved in the charged murder.  Defendant requested the identity of the citizen informant.  The People opposed the request.  After an in camera hearing, the trial court denied defendant's request.  The court concluded disclosure of the information was against the public interest because the need to preserve the confidentiality of the information outweighed the necessary disclosure, pursuant to Evidence Code section 1040, subdivision (b)(2).[8]  The court further noted it did not find the confidential informant was a material witness, and the court did not believe disclosure of the identity of the informant would lead to relevant investigation or discovery.

A second in camera proceeding occurred after defense counsel, during cross-examination of one of the detectives who had worked on the case, asked if the detective spoke to a citizen informant.  The prosecutor objected.

Defendant asks this court to review the record of the in camera hearings to determine whether the trial court erred in failing to disclose confidential informant identity.

We review the trial court's ruling for abuse of discretion.  (*People v. Suff* (2014) 58 Cal.4th 1013, 1059.)  "[T]he prosecution must disclose the name of an informant who is a material witness in a criminal case or suffer dismissal of the charges against the defendant. [Citation.]  An informant is a material witness if there appears, from the

---

[8]     Under Evidence Code section 1040, subdivision (b)(2), a public entity has a privilege to refuse to disclose "official information" when "[d]isclosure of the information is against the public interest because there is a necessity for preserving the confidentiality of the information that outweighs the necessity for disclosure in the interests of justice. . . ."

16

evidence presented, a reasonable possibility that he or she could give evidence on the issue of guilt that might exonerate the defendant. [Citation.] The defendant bears the burden of adducing ' " 'some evidence' " ' on this score." (*People v. Lawley* (2002) 27 Cal.4th 102, 159.) " '[T]he test of materiality is not simple relevance; it is whether the nondisclosure might deprive defendant of his or her due process right to a fair trial. [Citation.]' [Citation.]" (*People v. Lewis* (2009) 172 Cal.App.4th 1426, 1441.)

We have reviewed the record of the in camera proceedings. Based on that review, we have determined the trial court properly applied the above standard and did not err in rejecting the defense request for disclosure of the confidential informant's identity. (*People v. Lawley*, *supra*, at p. 159.)

## VI. The Prior Strike and Prior Serious Felony Enhancements Must Be Vacated

Defendant argues the prior strike and prior serious felony enhancements must be vacated because 1) the trial court failed to advise him of his constitutional rights before accepting an admission of the prior conviction and imposing the enhancements without a trial; and 2) defendant did not effectively admit the prior conviction. We vacate the sentence and remand for retrial of the prior conviction allegations.

### A. Background

In an amended information, the People alleged defendant suffered a prior "strike"-- a serious or violent felony within the meaning of section 667, subdivision (d) and section 1170.12, subdivision (b) -- a 2003 conviction for burglary (§ 459). The same conviction formed the basis of an allegation of a prior serious felony conviction within the meaning of section 667, subdivision (a)(1).

During defendant's trial testimony, he admitted he had suffered several prior convictions, including 2003 convictions for "burglary." Following closing arguments, the trial court raised the issue of the priors. The court noted: "[Defendant] has essentially admitted all the priors. I don't know if – at least the factual basis for the priors, but not necessarily the dates and all the case numbers. I don't know if that is something that you're going to consider that the court will decide subsequent to the jury's

17

verdict or if you require the jury to make that decision." Defense counsel said she would speak to defendant and have a decision before jury deliberations began the next day.

The next day the court returned to the issue: "We then have the issue of whether [defendant] will have the priors decided by the court. Previously, I think he's essentially admitted the priors anyway." Defense counsel responded: "Yes, he'll admit. He will waive the jury." The court stated: "All right. The court will accept the admissions at this time and it will not need to be decided by the jury. Okay."

At the later sentencing hearing, the court described the prior proceedings and stated: "[Defendant] admitted the additional prior conviction under Penal Code section 667(a)." When the court asked if there were any victim impact statements, the prosecutor responded by first stating: "[W]ith respect to [defendant's] admission of the prior conviction pursuant to 667(a)(1)," the prosecutor had a 969(b) packet he wished to submit into evidence. After the reviewing the packet, defense counsel had no objection. The prosecutor further explained: "I would just say this 969(b) package is the basis for the allegation in the amended allegation and I would ask that the court review it and I think that it substantiates the allegation." The packet was marked as a court exhibit. Defense counsel made a *Romero* motion,[9] which the prosecutor opposed. The prosecutor argued, in part, that defendant had not led a crime-free life since the 2003 conviction, as evidenced by subsequent convictions which were "substantiated by the 969(b) package put in front of the court." The court accepted the exhibit and admitted it into evidence "for purposes of sentencing." The court made no express finding as to the truth of the prior strike and prior serious felony allegations. However, the court later doubled the 25-years-to-life term pursuant to the Three Strikes Law and added a five-year enhancement pursuant to section 667, subdivision (a).

## B. Applicable Legal Principles

Defendant's argument is two-fold. Defendant contends the trial court erred in that: 1) defendant's admission of the prior conviction, through counsel, was invalid

---

[9] *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497.

18

because the trial court did not first advise him of his constitutional rights before accepting the admission; and 2) defendant did not effectively admit the prior conviction because he did not personally make the admission and, although he admitted suffering multiple 2003 burglary convictions in his trial testimony, he did not admit one of the convictions was for first degree burglary, and therefore a serious felony for purposes of sections 667 and 1170.12.  (§§ 667, subd. (d)(1), 1170.12, subd. (b)(1), 1192.7, subd. (c)(18).)  The People argue there was a court trial on the prior conviction allegations and defendant waived any objection to that court trial by failing to object below.  The People further assert the trial court properly found the prior conviction allegations true and it could properly consider defendant's trial testimony as evidence.  Finally, the People contend that even if defendant's argument is not forfeited and the trial court erred in failing to obtain a personal waiver or in relying on defendant's admission, any error was harmless.

When the People allege a prior conviction sentencing enhancement, the defendant has a statutory right to a jury trial on the factual issues raised by a denial of the allegation of prior convictions.  (*People v. Vera* (1997) 15 Cal.4th 269, 274; *In re Yurko* (1974) 10 Cal.3d 857, 863.)  The defendant may waive the right to a jury trial and have the court determine the truth of the allegation.  (§ 1158.)

A defendant may also admit a prior conviction.  However, "[b]efore a trial court may accept a defendant's admission of prior felony convictions, the court must advise the accused of the right against compulsory self-incrimination, the right to confrontation, and the right to a jury trial.  (*People v. Mosby* (2004) 33 Cal.4th 353, 359-360 . . . (*Mosby*); accord [*Boykin v. Alabama, supra,* 395 U.S. at p. 243 . . . , *In re Tahl* [*supra,* 1 Cal.3d at p. 132]; *In re Yurko* [*supra,* 10 Cal.3d 857].)  The trial court also must advise the accused of the penal consequences of admitting a prior conviction.  '[A]n accused, prior to the time the court accepts his admission of an allegation of a prior criminal conviction or convictions, is entitled to be advised:  (1) that he may thereby be adjudged an habitual criminal . . . ; (2) of the precise increase in the term or terms which might be imposed, if any . . . ; and (3) of the effect of any increased term or terms of imprisonment on the accused's eligibility for parole.'  [Citation.]"  (*People v. Sifuentes* (2011) 195 Cal.App.4th

19

1410, 1420.)  The court must obtain an express waiver of the defendant's constitutional rights before accepting an admission.  (*Mosby,* 33 Cal.4th at pp. 360-361.)

"[I]f the transcript does not reveal complete advisements and waivers, the reviewing court must examine the record of 'the entire proceeding' to assess whether the defendant's admission of the prior conviction was intelligent and voluntary in light of the totality of circumstances."  (*Mosby, supra,* 33 Cal.4th at p. 361.)  In *Mosby*, the defendant expressly and personally waived his right to a jury trial on a prior conviction allegation, but he was not advised of his rights to remain silent and confront witnesses.  (*Id.* at p. 364.)  After reviewing all of the circumstances, which included that the prior conviction was based on a guilty plea; the defendant had just participated in a jury trial in which he confronted witnesses and remained silent; and he was advised of his right to a trial on the alleged prior conviction, the court concluded the defendant's admission of the prior conviction was voluntary and intelligent.  (*Id.* at pp. 364-365.)

### C. Application

Our review of the record persuades us we must reject the People's contention that the trial court conducted a bench trial on the prior conviction allegations rather than relying on the defense admission.  In the colloquies between the court and defense counsel on the issue, both the court and defense counsel discussed not only the waiver of a jury trial, but defendant "admitting" the prior conviction allegations.  Although the prosecutor entered a 969(b) packet into evidence, he prefaced the introduction of the documents by stating: "with respect to [defendant's] admission of the prior conviction pursuant to 667(a)(1) . . ."  The court admitted the packet into evidence.  Yet, the court did not make any express findings that the evidence established the prior strike and serious felony enhancements were true beyond a reasonable doubt.  Indeed, the court made no findings at all with respect to the prior conviction allegations, and instead only indicated defendant had admitted the prior conviction.  Except for the introduction of the 969(b) packet, the record includes no indicia of a court trial on the prior conviction allegations.  When considered as a whole, the record reflects that the court and the parties

20

proceeded as if defendant had admitted the prior conviction, eliminating the need for a trial on the prior strike and serious felony allegations.

We must therefore determine whether the admission was valid. The court did not advise defendant of any of his constitutional rights before accepting the purported admission. In *Mosby*, the court summarized prior "silent record" cases, in which no express advisement and waiver of *Boykin-Tahl* rights were given or obtained before a defendant's admission of a prior conviction. The court concluded that in such cases, in which the defendant was not advised of the right to have a trial on an alleged prior conviction, and did not expressly waive the right to trial, it would not "infer that in admitting the prior the defendant has knowingly and intelligently waived that right as well as the associated rights to silence and confrontation of witnesses." (*Mosby*, *supra*, at p. 362.)

However, as noted above, the *Mosby* court distinguished cases in which partial advisements were given and, for example, the defendant was advised of the right to a trial on the prior conviction allegations, but was not advised of and did not waive the rights to silence and confrontation. In such cases, reversal is not necessarily required; instead the court is to determine whether under the totality of the circumstances it may be determined that the defendant's admission of a prior conviction was intelligent and voluntary. (*Mosby, supra,* 33 Cal.4th at p. 361.) We also note the issue of whether the "totality of the circumstances" test may be applied in a "silent record" case is currently pending before the California Supreme Court.[10]

In this case, reversal is necessary because the record, even when considered as a whole, does not indicate a voluntary and intelligent admission of the prior conviction in light of the totality of the circumstances. We acknowledge that defendant had just

---

[10]     An additional issue in the case is whether references to a defendant's constitutional rights at earlier stages of the proceedings and the defendant's criminal history are sufficient to support the conclusion that the defendant knowingly and voluntarily waived those rights. (*People v. Farwell*, review granted Feb. 3, 2016, S231009.)

experienced a jury trial in which he confronted witnesses and he also testified he suffered convictions for burglary in 2003.  But he did not testify as to the degree of the crimes.  As defendant's prior convictions occurred after the passage of Proposition 21, to qualify as a serious felony, the burglary must have been in the first degree.  (*People v. Garrett* (2001) 92 Cal.App.4th 1417, 1421-1424.)  The court did not advise defendant of any his rights with respect to the prior conviction allegation.  Defendant also did not personally or expressly waive any of those rights; instead, the court merely accepted defense counsel's statement that defendant would "admit" and "waive the jury."  (See *People v. Williams* (1980) 103 Cal.App.3d 507, 513 [purpose behind section 1025 requirement that defendant personally answer that he has suffered the subject prior conviction is to ensure the incriminatory statement is the defendant's own].)  In addition, the court twice suggested defendant had already "essentially admitted" the priors, potentially deemphasizing or obscuring that defendant had not admitted a first degree burglary and that he still had the right to a jury or court trial, to confront witnesses, and to remain silent.

This case is unlike *Mosby*, in which the trial court advised the defendant of his right to a jury or court trial on the prior conviction allegation and the defendant personally and expressly waived that right.  (*Mosby, supra,* 33 Cal.4th at pp. 357-358, 365.)  Instead, it more closely resembles *People v. Cross* (2015) 61 Cal.4th 164, in which the court found a stipulation to a prior conviction invalid since the court did not ask whether the defendant had discussed the stipulation with his lawyer, it did not ask any questions of the defendant personally "or in any way inform him of his right to a fair determination of the prior conviction allegation," the court had no information on how the alleged prior conviction was obtained, and nothing in the record affirmatively showed the defendant was aware of his rights as to the prior conviction allegation.  (*Id.* at p. 180.)

Here, the record does not affirmatively show that defendant provided an intelligent and voluntary admission of the prior conviction.  We therefore reverse the prior conviction findings; defendant may be retried on the prior conviction allegations.  (*People v. Sifuentes, supra,* 195 Cal.App.4th at p. 1421.)

22

## DISPOSITION

We vacate defendant's sentence and remand for retrial of the prior conviction allegations and resentencing.  In all other respects, the judgment is affirmed.


                                        BIGELOW, P.J.

We concur:


        RUBIN, J.


        GRIMES, J.

23